AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

**NORTHERN** _____ **DISTRICT OF** _____ **CALIFORNIA**

**FILED**

OCT 2 3 2007

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

| | |
|---|---|
| UNITED STATES OF AMERICA<br>**v.**<br>LAURO CORRAL | **CRIMINAL COMPLAINT** |

**CASE NUMBER:**

# 07-70619  WDB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about ___March 8 and 20, 2007___ in ___Contra Costa___ county, in the ___Northern___ District of ___California___ defendant(s) did, (Track Statutory Language of Offense)

knowingly and intentionally distribute methamphetamine, a Schedule II Controlled Substance,

in violation of Title ___21___ United States Code, Section(s) ___841(a)(1), (b)(1)(A)(viii), (b)(1)(B)(viii)___.

I further state that I am a(n) ___FBI Special Agent___ and that this complaint is based on the following
Official Title

facts:

See Attached Affidavitt

Continued on the attached sheet and made a part hereof:    ☒ Yes    ☐ No

Approved
As To
Form: _____
AUSA: GARTH HIRE

_____
Name/Signature of Complainant:

Sworn to before me and subscribed in my presence,

October 23, 2007
Date

at    Oakland, California
City and State

The Honorable Wayne D. Brazil
United States Magistrate Judge
Name & Title of Judicial Officer

_____
Signature of Judicial Officer

This form was electronically produced by Elite Federal Forms, Inc.

1  UNITED STATES DISTRICT COURT                    )
2                                                   ) ss:
   NORTHERN DISTRICT OF CALIFORNIA                  )
3

4                 **AFFIDAVIT IN SUPPORT OF COMPLAINT**

5      I, Doug Hunt, Special Agent of the Federal Bureau of Investigation, being duly sworn,

6  hereby declare as follows:

7  **I.      INTRODUCTION**

8      1.      I am a Special Agent ("SA") of the Federal Bureau of Investigation ("FBI") and

9  have been so employed since October of 1995.  I am currently assigned to the Violent Crimes

10 and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where

11 my responsibilities involve the investigation of gangs and narcotics trafficking.  During my

12 tenure in the FBI, I have been involved in numerous investigations of gang-related narcotics

13 traffickers.  I have participated in physical and electronic surveillance and undercover narcotics

14 transactions, executed search warrants, and reviewed recorded countless conversations of drug

15 traffickers.  As a federal agent, I am authorized to investigate violations of laws of the United

16 States and am a law enforcement officer with authority to execute warrants issued under the

17 authority of the United States.

18 **II.     PURPOSE OF AFFIDAVIT**

19     2.      This affidavit is being submitted in support of a criminal complaint and arrest

20 warrant.  As set forth below, there is probable cause to believe that LAURO CORRAL has

21 violated 21 U.S.C. § 841(a)(1) (~~possession with intent to distribute a controlled substance~~).  DISTRIBUTION OF A CONTROLLED SUBSTANCE DH

22     3.      This affidavit is submitted for the limited purpose of securing the requested

23 complaint and arrest warrant, and therefore, I have not included each and every fact known to me

24 concerning this investigation.  I have set forth only the facts that I believe are necessary to

establish probable cause in support of this complaint.

## III.    PROBABLE CAUSE

## Criminal History of LAURO CORRAL

4.      On June 13, 2007, I reviewed the criminal history for LAURO CORRAL, which indicates that he has a 2002 conviction for distribution of marijuana in Kern County, a 2002 conviction for possession of narcotics for sale in Santa Clara County, and a 2003 misdemeanor conviction for providing false identification to a Peace Officer.   This criminal record also indicates that LAURO CORRAL has used two aliases when being arrested, including Felipe Figueroa Beltran and Ricardo Ibarra.   Furthermore, the criminal history also indicates LAURO CORRAL has an outstanding arrest warrant for a probation violation from Santa Clara County and an outstanding arrest warrant from Kern County for a narcotics violation.

## Background on CW-1

5.      In April, 2007, Detective Kenneth Westermann of the Contra Costa County Sheriff's Department told me that within the preceding several months, he had received information from a cooperating witness (hereafter referred to as "CW-1") concerning a methamphetamine supplier named "LAURO."   Detective Westermann has utilized CW-1 for approximately one year.  Detective Westermann met CW-1 during a search of his/her residence in June, 2006, wherein approximately one quarter of a pound of methamphetamine was seized. Thereafter, CW-1 agreed to provide information and cooperate with the Contra Costa County Sheriffs's Office.   Since that time, Detective Westermann is not aware of any instances in which CW-1 has provided false information.  Detective Westermann has previously used CW-1 in several different investigations, including a federal investigation involving narcotics trafficking

2

in Richmond, California. He was able to corroborate information provided by CW-1. In the past

year, CW-1 has made controlled purchases of methamphetamine at the direction and under the

supervision of Detective Westermann and myself. Information provided by CW-1 has led to

arrests for burglary and robbery. Detective Westermann considers the information provided by

CW-1 to be reliable.

6.    In June 2007, I met with CW-1 on approximately ten occasions. I have confirmed

the information CW-1 has given me on those occasions. I am not aware of any occasion on

which CW-1 has provided false information. Furthermore, I consider the information provided

by CW-1 to be reliable. CW-1 is providing assistance on this and other related criminal matters

in exchange for the payment of future relocation and related expenses by the FBI. Additionally,

CW-1 has a potential pending charge resulting from a narcotics investigation by the Contra Costa

County Sheriffs's Department. As mentioned previously, in that investigation, approximately one

quarter of a pound of methamphetamine was located inside the residence of CW-1. No formal

agreements have been made between the U.S. Attorney's Office or the District Attorney's Office

and CW-1 regarding any resolution of these charges. Detective Westermann has advised CW-1,

however, that so long as he/she provides truthful information, Detective Westermann will not

seek charges based on the above-referenced conduct.

7.    I have reviewed CW-1's lengthy criminal history. CW-1 has arrests for narcotics

trafficking, vehicle theft, battery, burglary, arson, criminal threats and weapons violations. CW-1

has criminal convictions for possession of a hypodermic needle, possession of a dangerous

weapon, possession of a controlled substance for sale, receiving stolen property, felon in

possession of a firearm, assault, and being under the influence of a controlled substance. CW-1

has admitted to me selling and using illegal narcotics.

**Information from CW-1 regarding "LAURO"**

8.      The purpose of the instant investigation was to use CW-1 to purchase

methamphetamine from a person known to CW-1 as "LAURO." CW-1 has known LAURO for

less than a year.   CW-1 originally met LAURO during a methamphetamine transaction.

LAURO came with a Hispanic male from Vallejo, California, who was providing CW-1 with

methamphetamine.   Since that meeting, CW-1 has purchased methamphetamine from LAURO

approximately 50 times.   CW-1 stated that he/she usually purchased quarter pound quantities of

methamphetamine, but more recently has been purchasing an eighth of a pound quantities of

methamphetamine.   On one occasion, LAURO told CW-1 that he buys pound quantities of

methamphetamine and breaks them up for sale. CW-1 stated that he/she usually meets LAURO

at LAURO's sister's apartment on Pennsylvania Avenue in Richmond, California.  CW-1 once

was introduced to LAURO's sister and was told that her name was Sylvia.  CW-1 described

Sylvia as an attractive Hispanic female.

9.      During previous narcotics transactions,  CW-1 contacted LAURO by telephone to

arrange methamphetamine purchases.  When CW-1 contacts  LAURO by phone,  it usually takes

LAURO approximately 20 minutes to deliver the methamphetamine.   On one occasion, LAURO

sent another Hispanic male to deliver the methamphetamine, but on all other occasions, he

delivered it himself.  CW-1 indicated that LAURO drives several cars, including a Volkswagen

Jetta, a Dodge Durango, and a Hummer.   LAURO frequently changes his telephone numbers,

but most recently they have been 510-776-7689 and 510-776-7760.

10.   In December 2007, Detective Westermann showed CW-1 a photograph from driver's

license A7268750 of LAURO CORRAL, date of birth, January 19, 1973. CW-1 indicated that

the person depicted in the driver's license photograph of LAURO CORRAL was the person CW-

4

1    I knew as LAURO.

2    **Controlled sale of methamphetamine from LAURO to CW-1 on March 8, 2007**

3

4      11.    On March 8, 2007, at the direction of Detective Westermann, CW-1 conducted a

5 controlled purchase of methamphetamine from CORRAL. I have reviewed all reports regarding

6 this controlled purchase, including the surveillance report and CW-1's debrief, and have spoken

7 with agents and detectives who participated in this operation. I have also reviewed the covert

8 audio and video recording of this controlled purchase.

9

10      12.    Specifically, on March 8, 2007, at approximately 11:00 am, CW-1 placed a

11 telephone call to LAURO CORRAL. During the call, CW-1 asked CORRAL for 3 ounces of

12 methamphetamine. CORRAL replied that he had at least 2 ½, but would sell him/her 3 if he had

13 it. They agreed to a price of $750 per ounce and $325 for the half ounce. CW-1 drove to an

14

15 apartment complex at 1011 Pennsylvania Avenues in Richmond, California as instructed by

16 LAURO. As stated previously, CW-1 indicated that he/she had met LAURO there many times to

17 conduct narcotics transactions. CW-1 saw a yellow Hummer SUV that belongs to LAURO but

18 did not see LAURO. Thereafter CW-1 indicated that he/she again called LAURO. LAURO told

19 CW-1 he would be there in a few minutes.

20

21      13. Thereafter, a search of CW-1 was performed prior to the installation of a recording

22 device on his/her person and CW-1's vehicle. CW-1 was provided with money and given

23 instructions on how to conduct the transaction. At approximately 2:10 p.m., detectives and

24

25 agents conducting surveillance for this controlled purchase of methamphetamine observed a

26 Hispanic male wearing a red t-shirt exit 682 Fifth Street, Richmond, California, and enter a black

27 Toyota Scion bearing dealer plates that was parked in front of the residence. The Hispanic male

28 then pulled away from the residence as the sole occupant of the vehicle. At approximately 2:12

5

p.m., the black Toyota Scion bearing dealer plates arrived at the apartment complex at 1011

Pennsylvania Avenue, where CW-1 was waiting and pulled into the parking lot of the apartment

complex.    During this time, CORRAL's  yellow Hummer with California License number

5AQN547 was observed parked in the parking lot at 1011 Pennsylvania Avenue.  At

approximately 2:16 p.m. the black Toyota Scion bearing dealer plates exited the parking lot of

the apartment complex and turned toward Harbour Avenue.  At approximately 2:19 p.m. the

black Toyota Scion bearing dealer plates returned to 682 Fifth Street, Richmond, California.  The

same Hispanic male observed earlier in the red T-shirt exited the vehicle and entered the

residence.  When surveillance officers were shown pictures of LAURO CORRAL, they indicated

the person depicted in the driver's license photograph appeared to be the same individual driving

the Toyota Scion.

14.  CW-1 was debriefed after the transaction.  According to CW-1, LAURO arrived at

the apartment complex at 1011 Pennsylvania Avenue in a station wagon.  LAURO and the CW-

1 went into the laundry room of the apartment complex.  LAURO gave CW-1 approximately 1

ounce, ½ ounce, and 1/8 ounce of methamphetamine in separate baggies in exchange for $975.

LAURO told CW-1 that was all of the methamphetamine he had but would be going to Los

Angeles that evening to get another load.  At approximately 2:30 p.m., three baggies containing

suspected methamphetamine were recovered from CW-1.  CW-1 was again searched  for money,

weapons, and other contraband with negative results.  The baggies and suspected

methamphetamine were placed into evidence at the Contra Costa County Sheriff's Department.

15.    I have reviewed the covert audio and video recording of the above-described

transaction.  The video recording depicts a Hispanic male arriving at the agreed-upon residence

in a black Toyota Scion.   The Hispanic male and CW-1 then enter the laundry room of the

1   apartment building.   The Hispanic male and CW-1 negotiate how much is to be paid for

2   methamphetamine.   Thereafter, the Hispanic Male can be seen receiving cash from CW-1.  Later

3   the video depicts CW-1 returning to his/her vehicle, returning to the staging area and speaking

4   with agents as they recover the recording equipment and baggies containing the white crystalline

5   substance.

6   

7        16.    I have reviewed the Department of Motor Vehicles (DMV) driver's license

8   photograph for LAURO CORRAL.  I believe the person depicted in the driver's license

9   photograph of CORRAL is the same individual who can be seen selling the methamphetamine to

10  CW-1 in the covert video recording.

11  

12  **Controlled sale of methamphetamine from LAURO to CW-1 on March 20, 2007**

13       17.    On March 20, 2007, CW-1 placed a consensually monitored and recorded

14  telephone call to 510-776-7689.   In this phone call, CW-1 and a male who CW-1 indicated was

15  LAURO CORRAL exchanged greetings.   Thereafter,  CW-1 inquired if there was a shortage,

16  meaning a shortage of methamphetamine.   CORRAL indicated there was and that a lot of the

17  people he had been calling did not have any.   CW-1 then asked CORRAL if he had "good shit"

18  or if it was "mediocre."   CORRAL replied that it was "good good good good."   CW-1 then

19  asked if he/she could get a discount on the price.  CORRAL asked CW-1 "how many you want to

20  get?"   CW-1 indicated that he/she wanted to get four [ounces of methamphetamine].   CORRAL

21  indicated that he would charge "29" [$2,900].   CORRAL and CW-1 then arranged to meet in 20

22  minutes.

23       18.    Thereafter, a search of CW-1 was performed prior to the installation of a

24  recording device on his/her person and CW-1's vehicle.  Surveillance was initiated around the

25  location where CORRAL delivered methamphetamine to CW-1.  CW-1 was provided with

1   Contra Costa County cash funds to purchase methamphetamine and given instructions on how to

2   conduct the transaction.  The meeting was also recorded with audio and visual recording

3   equipment.  For this transaction, CW-1 was provided with $2,900 and given specific directions

4   on how to conduct the meeting. Approximately 20 minutes later, agents and officers conducting

5   surveillance observed CW-1 meeting with LAURO CORRAL in a small parking lot near 1011

6   Pennsylvania Avenue in Richmond, California.

7        19.    Following the transaction, CW-1 was debriefed.  According to CW-1, CORRAL

8   got into CW-1's car and placed a plastic baggy of methamphetamine on the floor on the driver's

9   side of the vehicle.  CW-1 counted out  $2,900 and gave it to CORRAL.  CW-1 noticed that

10  CORRAL had a paper bag and asked CORRAL what was in the bag.  CORRAL said that it was

11  "his."  CORRAL showed CW-1 what was in the bag.   CW-1 indicated that inside the paper bag

12  was a plastic bag containing approximately one pound of methamphetamine in addition to the

13  four ounces CW-1 was purchasing.    A short time later, a plastic baggy containing

14  approximately four ounces of suspected methamphetamine were recovered from the CW-1.

15  CW-1 was again searched for money, weapons, and additional contraband with negative results.

16  The plastic baggy of suspected methamphetamine was  placed into evidence at the Contra Costa

17  County Sheriff's Department.

18  **DEA Lab results regarding methamphetamine purchased from LAURO CORRAL on**

19  **March 8, 2007 and March 20, 2007**

20       20.    On June 4, 2007,  I reviewed Drug Enforcement Laboratory Results for the

21  suspected methamphetamine purchased from LAURO CORRAL on March 20, 2007.  A DEA

22  report dated April 24, 2007, exhibit number 1B4, indicates that the narcotics purchased from

23  LAURO CORRAL  tested positive for methamphetamine with a net weight of 110.5 grams,

24  gross weight of 148.0 grams, and purity of 85.9%.  The amount of actual drug found was 94.9

grams with a reserve weight of 109.5 grams. This DEA report also indicates exhibit number 1B5, which represents the narcotics purchased from LAURO CORRAL on March 8th, 2007. Exhibit number 1B5 tested positive for methamphetamine with a net weight of 45.3 grams, gross weight of 80.2 grams, and purity of 96.3%. The amount of actual drug found was 43.6 grams with a reserve weight of 44.4 grams.

## VI.    CONCLUSION

21.    For the reason stated above, I believe there is probable cause to support a complaint and arrest warrant for violations of 21 U.S.C. § 841(a)(1) (distribution of a controlled substance). I therefore respectfully request that the Court issue the requested Complaint.


DOUG HUNT
Special Agent, Federal Bureau of Investigation

Sworn to before me this
23rd day of October, 2007

HONORABLE WAYNE D. BRAZIL
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT**
**PENALTY SHEET**

***UNITED STATES v. LAURO CORRAL***

**COUNT ONE: MARCH 8, 2007**
**21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii)**


<u>*If 851 Information alleging prior felony narcotics conviction FILED*</u>:

| | |
|---|---|
| Imprisonment: | Maximum Life Imprisonment<br>Mandatory Minimum 20 Years Imprisonment or<br>Mandatory Life Imprisonment |
| Fine: | Maximum $8,000,000 |
| Supervised Release: | Maximum Lifetime Supervised Release<br>Mandatory Minimum 10-Year Term of Supervised Release |
| Special Assessment: | $100 |

<u>*If No 851 Information alleging prior felony narcotics conviction NOT FILED*</u>:

| | |
|---|---|
| Imprisonment: | Maximum Life Imprisonment<br>Mandatory Minimum 10 Years Imprisonment |
| Fine: | Maximum $4,000,000 |
| Supervised Release: | Maximum Lifetime Supervised Release<br>Mandatory Minimum 5-Year Term of Supervised Release |
| Special Assessment: | $100 |


**COUNT TWO: MARCH 20, 2007**
**21 U.S.C. §§ 841(a)(1), (b)(1)(B)(viii)**


<u>*If 851 Information alleging prior felony narcotics conviction FILED*</u>:

| | |
|---|---|
| Imprisonment: | Maximum Life Imprisonment<br>Mandatory Minimum 10 Years Imprisonment |

Page 1 of 2

Fine:                          Maximum $4,000,000

Supervised Release:            Maximum Lifetime Supervised Release
                               Mandatory Minimum 8-Year Term of Supervised Release

Special Assessment:            $100

_If No 851 Information alleging prior felony narcotics conviction NOT FILED:_

Imprisonment:                  Maximum 40 Years Imprisonment
                               Mandatory Minimum 5 Years Imprisonment

Fine:                          Maximum $2,000,000

Supervised Release:            Maximum Lifetime Supervised Release
                               Mandatory Minimum 4-Year Term of Supervised Release

Special Assessment:            $100